**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DHYMONIQUE ALEXANDER, *individually and on behalf of all others similarly situated*,<br>810 Lawndale Drive, Apt D305<br>Reidsville, NC 27320<br><br>Plaintiff,<br><br>v.<br><br>KELLY & ASSOCIATES INSURANCE GROUP, INC. d/b/a KELLY BENEFITS,<br>1 Kelly Way, Suite 100<br>Sparks, Baltimore County, MD 21152<br><br>Defendant. | Case No. 1:25-cv-01343<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dhymonique Alexander ("Plaintiff"), by and through her undersigned counsel, hereby brings this Class Action Complaint on behalf of herself and all other similarly situated persons ("Class Members") against Defendant Kelly & Associates Insurance Group, Inc. d/b/a Kelly Benefits ("Kelly Benefits" or "Defendant"), alleging as follows based upon information, belief, and investigation of counsel, except as to the allegations specifically pertaining to herself, which are based upon personal knowledge.

**NATURE OF THE ACTION**

1. Plaintiff brings this action against Defendant for its failure to properly secure and safeguard individuals' highly valuable personally identifiable information ("PII") and protected health information ("PHI") including, *inter alia*, names, Social Security numbers, tax ID numbers, dates of birth, medical information, health insurance information, and financial account information.[1]

[1] *Notice of Data Security Event*, Kelly Benefits, https://kellybenefits.com/data-event/ (last visited April 25, 2025).

2. Businesses that handle PII and PHI owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3. The harm resulting from a data privacy breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

4. Defendant provides benefits administration services, broker and consulting services, and payroll solutions to businesses of all sizes.[2]

5. In order to provide these services, Defendant is indirectly or directly entrusted with individuals' PII and PHI. As Defendant is or should have been aware, these types of personal and sensitive data are highly targeted by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to Class Members.

6. By collecting and storing individuals' PII and PHI, Defendant has a resulting duty to secure, maintain, protect, and safeguard the PII and PHI with which it was entrusted against unauthorized access and disclosure through reasonable and adequate security measures. Defendant

[2] Kelly Benefits, https://kellybenefits.com/ (last visited April 25, 2025).

is also well aware that PII and PHI are highly valuable to cybercriminals, making it foreseeable that Defendant would be the target of a cyberattack.

7. Despite Defendant's duty to safeguard the PII and PHI with which it was entrusted, and the foreseeability of a data breach, Plaintiff's and Class Members' sensitive information collected and stored by Defendant was accessed and acquired by unauthorized third parties during a data breach that occurred on or around December 12, 2024 through December 17, 2024 when certain files on Kelly Benefits' environment were copied and taken (the "Data Breach").[3] The Data Breach resulted in the unauthorized access of the PII and PHI of approximately 263,000individuals.[4]

8. As a direct and proximate result of Defendant's failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PII and PHI have been compromised by cybercriminals.

9. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff, on behalf of herself and the Class as defined herein, brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

[3] *Notice of Data Security Event*, *supra* n. 1.

[4] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/31cc467f-60ce-43da-985b-1157966dc553.html (last visited April 25, 2025).

11. To recover from Defendant from these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) investigate and disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by Defendant; and (3) provide, at Defendant's own expense, all impacted victims with lifetime identity protection services.

**PARTIES**

12. Plaintiff Dhymonique Alexander is an adult who, at all relevant times, is and was a citizen of the State of North Carolina.

13. Defendant Kelly & Associates Insurance Group, Inc. is a Maryland corporation with a principal place of business located at 1 Kelly Way, Suite 100, Sparks, MD 21152.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in the State of Maryland.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant resides in this District; a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District; and Defendant conducts substantial business within this District.

## FACTUAL BACKGROUND

### A. Defendant Collected and Stored Plaintiff's and Class Members' PII and PHI

17. Kelly Benefits is one of the nation's largest and fastest-growing providers of benefits administration and technology, broker and consulting services, payroll solutions and other comprehensive tools and strategies to serve businesses of all sizes.[5]

18. Kelly Benefits also provides educational series that cover the current issues affecting healthcare, payroll, compliance and benefits that help businesses shape their organizational strategy and business plans.[6]

19. Upon information and belief, during the regular course of administering its services, Defendant receives, creates, maintains, and handles individuals' PII and PHI. This information includes, *inter alia*, names Social Security numbers, tax ID numbers, dates of birth, medical information, health insurance information, and financial account information.

20. Plaintiff and Class Members directly or indirectly entrusted Defendant with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Defendant would safeguard their highly sensitive PII and keep their PHI confidential.

21. Due to the sensitivity of the PII and PHI that Defendant handles, collects, and stores, it is or should have been aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

22. By requesting, obtaining, collecting, storing, and deriving a benefit from Plaintiff's and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

---

[5] *Supra* n. 2.
[6] *Id.*

23. Defendant expressly recognize this duty purporting to "maintain[] a robust information security program to ensure the protection and availability of [its] customers' sensitive data."[7]

24. Despite the existence of these duties, Defendant failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI, and ultimately allowed nefarious third-party hackers to compromise Plaintiff's and Class Members' PII and PHI.

**B. The Risks of Storing Valuable PII and PHI Are Well-Known to Third-Party Service Providers**

25. Given its role in handling sensitive data, Defendant was well aware at all relevant times that the PII and PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and of significant value to those who seek to use it for wrongful purposes.

26. Defendant also knew that a breach of its computer systems, and the resulting exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

27. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at third-party service providers, including Infosys MaCamish Systems, LLC (third-party service provider, 6 million individuals, June 2024); NextGen Healthcare, Inc. (EHR provider, 1.5 million individuals, April 2024); Change Healthcare (payment cycle management provider, 190 million individuals, February 2024); Perry Johnson & Associates (medical transcription provider, 13 million individuals, November 2023); OneTouchPoint, Inc. (printing and mailing provider, 4.1 million individuals, July 2022), These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

[7] *KTBSonline*, Kelly Benefits, https://kellybenefits.com/resources/ktbsonline/(last visited April 25, 2025).

28. PII has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[8] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

29. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[9]

30. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[10]

31. Third party providers, including vendors, suppliers, and software suppliers, have increasingly become targets for cybercriminals in recent years with 35.5 percent of data breaches in 2024 originating from third-party compromises.[11]

32. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2023, 5,887 healthcare data breaches of 500 or more individuals

---

[8] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[9] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[10] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited April 25, 2025).

[11] Steve Alder, *More Than One-Third of Data Breaches Due to Third-Party Compromises*, HIPAA Journal (Mar. 28, 2025), https://www.hipaajournal.com/more-than-one-third-data-breaches-third-party-compromises/#:~:text=According%20to%20a%20recent%20report,breaches%20is%20not%20always%20disclosed.

have been reported to Health and Human Services' Office of Civil Rights. Those breaches have resulted in the exposure of 519,935,970 healthcare records, a number that equates to 1.5x the population of the United States.[12]

33. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[13] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[14]

34. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

35. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

36. The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

Keep in mind that a new number probably will not solve all your problems. This is

---

[12] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited April 25, 2025).

[13] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[14] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

> because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[15]

37. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

38. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[16] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[17]

---

[15] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[16] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[17] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers(archived Feb. 9, 2025), https://web.archive.org/web/20250209070340/

39. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[18]

40. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[19]

41. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get

---

https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[18] *Security Breaches in Healthcare in 2023*, *supra* note 18.

[19] *Id.*

hired for a job, or even been fired by their employers.[20]

42. Even where cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

43. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

44. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[21] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[22]

45. Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences that would arise

---

[20] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[21] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[22] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**C. Defendant Breached Its Duty to Protect PII and PHI**

46. On or around March 3, 2025, Defendant learned of suspicious activity within its computer environment. While investigating the disruption, Kelly Benefits determined that its computer environment was subject to unauthorized access between December 12, 2024 and December 17, 2024.[23]

47. Despite discovering the Data Breach in December 2024, Kelly Benefits waited approximately four months before notifying impacted individuals. Indeed, Defendant did not begin notifying impacted individuals of the Data Breach until on or around April 9, 2025, when it posted a notice of the Data Breach through a press release,[24] and began to file notifications of the Breach with the requisite authorities.[25]

48. Defendant describes the circumstances surrounding the Data Breach as follows:

> Kelly Benefits learned of suspicious activity within our environment and immediately launched an investigation.... The investigation determined Kelly Benefits' environment was subject to unauthorized access between December 12, 2024 and December 17, 2024 and certain files were copied and taken.[26]

49. At or around this time, Defendant also began to send notification letters to affected individuals.[27]

[23] *Notice of Data Security Event*, supra n. 1.
[24] *Id*.
[25] *OCR Breach Portal*, U.S. Department of Health and Human Services Office for Civil Rights, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited April 25, 2025).
[26] *Notice of Data Security Event*, supra n. 1.
[27] *Id.*

50. Defendant indicated that a wide variety of PII and PHI was compromised in the Data Breach, including, *inter alia*, names, Social Security numbers, tax ID numbers, dates of birth, medical information, health insurance information, and financial account information.[28]

51. Defendant further indicated that the PII and PHI of 263,000 individuals were affected by the Data Breach.[29]

52. Based on Defendant's own statements, cybercriminals intentionally accessed Defendants' computer systems in an attack designed to access Plaintiff's and Class Members' valuable PII and PHI stored therein, and that these malicious actors were successful in the attack.

53. As a direct and proximate result of Defendant's failure to implement and maintain adequate security measures the PII and PHI of over 263,000 individuals—including Plaintiff and Class Members—was exposed to unknown, malicious actors during the Data Breach. Furthermore, it will be nearly impossible for Plaintiff and the Class to ever ensure that their stolen PII and PHI has been secured and will not be further disseminated.

**D. Defendant Failed to Comply with FTC Guidelines**

54. Defendant is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

[28] *Id.*
[29] OCR Breach Portal, *supra* n. 30.

55. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[30]

56. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[31] The guidelines recommend that businesses implement the following:

a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[32]

57. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require

[30] *See* Federal Trade Commission, *Start with Security: A Guide for Business* (June 2015), available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[31] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[32] *Id.*

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

58. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59. Upon information and belief, Defendant failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

60. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[34]

61. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection,

---

[33] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[34] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

and incident response.[35] Upon information and belief, Defendant failed to adhere to the NIST guidance.

62. Upon information and belief, Defendant's failure to protect massive amounts of PII and PHI is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

63. Defendant was well aware of its obligations to use reasonable measures to protect individuals' PII and PHI. Defendant also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendant nevertheless failed to comply with its data security obligations, leading to the compromise of Plaintiff's and Class Members' PII and PHI.

**E. Plaintiff and Class Members Suffered Damages**

64. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

65. Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff

---

[35] *Id.* at Table 2, 26-43.

and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been greatly diminished by its exposure in the Data Breach.

66. As a result of Defendant's failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

67. With respect to data breaches specifically in the healthcare sector, a study has found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[36]

68. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[37]

69. The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[38]

70. Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[39]

---

[36] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, Health IT Sec. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[37] *Id*.
[38] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[39] *Id*.

71. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[40]

72. Indeed, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[41]

73. Plaintiff and Class Members are at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which it was entrusted.

74. Additionally, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## F. Plaintiff's Experience

75. Plaintiff provided her PII and PHI, directly or indirectly, to Defendant in order to utilize the services of a customer of Kelly Benefits. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's PII and PHI, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Defendant, however, did not take reasonable

---

[40] *The Potential Damages & Consequences of Medical Identity Theft & Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[41] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

care of Plaintiff's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendant's inadequate security measures.

76. Plaintiff received a notification letter dated April 9, 2025 from Defendant informing her that her PII and PHI entrusted to Kelly Benefits was implicated in the Data Breach.

77. Since receiving notice of the Data Breach, Plaintiff has been required to spend her valuable time and effort in an attempt to mitigate any misuse of her PII and PHI. These mitigation efforts include time and effort spent: reviewing her credit for suspicious activity. Plaintiff would not have to undertake these time intensive measures but for the Data Breach.

78. As a direct and proximate result of the Data Breach, Plaintiff has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of her PII and PHI; (b) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

79. Further, knowing that hackers accessed and possibly exfiltrated her PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience frustration, worry, and stress.

80. As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## CLASS ALLEGATIONS

81. Plaintiff brings this Class Action on behalf of herself and all other similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

82. Plaintiff seeks to represent a Class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the Data Breach of Defendant's systems which occurred on or around December 12, 2024 through December 17, 2024.

83. Excluded from the Class is Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

84. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

85. **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are at least thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 263.000 individuals.

86. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

d. Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' PII and PHI;

e. Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PII and PHI;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

87. **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

88. **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

89. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

90. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

91. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

92. **Ascertainability:** Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
## (On Behalf of Plaintiff and the Class)

93. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 92 above as if fully set forth herein.

94. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiff and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

95. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

96. Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

97. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its technology, infrastructure, and cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore,

the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure, unreasonable data security measures.

98. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

99. Defendant's duty also arose from its special relationship with Plaintiff and Class Members. Indeed, Defendant, which receives, maintains, and handles the PII and PHI with which it was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

100. Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duty are identified above.

101. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing

to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII and PHI.

102. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

103. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII and PHI;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h. Damages to and diminution in value of their PII and PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard

Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

104. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 92 above as if fully set forth herein.

106. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

107. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI it obtained when providing health benefits and other administration services.

108. Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

109. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

110. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

111. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered injuries, including those identified above in paragraph 103.

112. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

113. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 92 above as if fully set forth herein.

114. Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Kelly Benefits and that was ultimately accessed or compromised in the Data Breach.

115. Plaintiff and Class Members conferred a benefit upon Kelly Benefits in the form of their highly valuable PII and PHI that was entrusted to Defendant. Kelly Benefits' business model would not exist save for the need to ensure the security of Plaintiff's and Class Members' PII in order to provide its services.

116. The relationship between Kelly Benefits and Plaintiff and the Class is not attenuated, as Plaintiff and Class Members had a reasonable expectation that the security of their PII and PHI would be maintained when they provided their PII and PHI to Defendant's clients.

117. Kelly Benefits accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Upon information and belief, this financial benefit was, in part, conferred, from the receipt of Plaintiff's and Class Members' PII and PHI.

118. Kelly Benefits also understood and appreciated that the PII and PHI pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of the PII and PHI.

119. But for Kelly Benefits' willingness to commit to properly and safely collecting and maintaining the security of Plaintiff's and Class Members' PII and PHI, their sensitive information would not have been transferred to and entrusted to Kelly Benefits. Further, if Defendant had disclosed that its data security measures were inadequate, Kelly Benefits would not have gained the trust of its clients.

120. As a result of Kelly Benefits' wrongful conduct, Plaintiff and Class Members suffered damages in an amount equal to the difference between their payments made with reasonable data security and privacy practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data security and privacy practices and procedures that they received.

121. Kelly Benefits' enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class Members' PII and PHI, while at the same time failing to securely maintain that information from unauthorized access and compromise.

122. In particular, Kelly Benefits enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Kelly Benefits instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

123. Kelly Benefits should not be permitted to retain the money belonging to Plaintiff and Class Members. It would be unjust, inequitable, and unconscionable to retain the benefits it received and is still receiving from Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal and state laws and industry standards.

124. The benefit conferred upon, received, and enjoyed by Kelly Benefits was not conferred gratuitously, and it would be inequitable and unjust for Kelly Benefits to retain the benefit.

125. Plaintiff and Class Members are without an adequate remedy at law.

126. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services, or Defendant should be compelled to place a percentage of all future profits into a common fund or constructive trust, for the benefit of Plaintiff

and Class Members, designed to represent the value obtained by the use of the inadequately secured PII and/or PHI compromised as a result of the Data Breach.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

127. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 92 above as if fully set forth herein.

128. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

129. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

130. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a. Defendant owed a legal duty to secure individual's PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

b. Defendant breached and continue to breach this legal duty by failing to employ reasonable measures to secure individual's PII and PHI.

131. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

132. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of any of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

133. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

134. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For compensatory damages on behalf of Plaintiff and the Class;

D. For punitive damages on behalf of Plaintiff and the Class;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Declaratory and injunctive relief as described herein;

G. For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I. Awarding pre- and post-judgment interest on any amounts awarded;

J. For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K. Awarding of such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: April 25, 2025

Respectfully submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch (Bar No. 29779)
Gerald D. Wells, III*
Lynch Carpenter, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 322-9243
gary@lcllp.com

*Attorney for Plaintiff and the Proposed Class*
**Pro hac vice* application forthcoming